Hillsborough, }
April 4, 1944. }   No. 3472.

### STATE *v.* CORNELIUS BASS.

### STATE *v.* CHARLIE CLARK.

*Stephen M. Wheeler*, Attorney-General, *Ernest R. D'Amours*, Assistant Attorney-General and *J. Vincent Broderick*, County Solicitor (*Mr. Wheeler* orally), for the State.

*William G. McCarthy* (by brief and orally), for the defendant, Charlie Clark.

*William H. Craig* (by brief and orally), for the defendant, Cornelius Bass.

JOHNSTON, J.   The defendant Clark was charged with committing the crime upon one Isabel Martel on August 29, 1943, at Manchester. Bass was accused of being a principal by being present, aiding and abetting.   These men were members of the Army of the United States in time of war and the question is raised of the jurisdiction of New Hampshire over their persons, although the ruling of the trial Court that it had jurisdiction was finally agreed to be correct by counsel for Bass.   The military authorities voluntarily surrendered them for trial by the courts of this State and have not since made any claim to exclusive jurisdiction.   Clearly it is not a right of the alleged offenders to dictate whether the military or civil courts should try them.   *People* v. *Denman*, 179 Cal. 497, 505; *Funk* v. *State*, 84 Tex. Crim. 402, 405.

The defendants moved for directed verdicts of not guilty on the ground of the insufficiency of the evidence.   The complainant Mrs. Martel testified that she left her home at 115 Spruce Street a few minutes after midnight to look for her husband at his brother Lionel's house at 229 Spruce Street.   She was worried about him as he had promised her that they would go out together around 10:30 or 11 o'clock.   Two or three times before she had gone to look for him at his brother's although not at the present address.   As she passed a large tree at a vacant lot east of 177 Spruce Street, two soldiers jumped from in back and grabbed her.   When she started to scream the shorter of the two put a handkerchief to her mouth, which she got away from him.   She was pushed or dragged some twenty feet into the lot and as the taller swung her about, the shorter man tripped her.   The former held her arms and had intercourse with her al-

though he did not complete the act. All the time, Mrs. Martel testified, she screamed as loud as she could, struggled and kicked to the extent that she perspired. Venetia Panas who lived at 177 Spruce Street was aroused and heard a call for help three times and "Oh, leave me alone, please. You know I am a married woman, please. You know I am a sick woman." Mrs. Martel was in the third day of her monthly period. Mrs. Panas was moved to exclaim, "What you doing over there, you . . ." Mrs. Christie Papajikos who lived across Spruce Street heard the call for help and twice the request "leave me alone." She hollered across the street, "What's this, get out of here." It was findable that the interference of these two women was due to abuse of one of their sex. At the first holler from these women the shorter man left and ran towards Beech Street. The taller stayed and threatened Mrs. Martel, who was continuing her screaming and asking to be let go, that if she didn't keep her mouth shut he would rip her guts out. A machine went by, and frightened by that and the hollering, he too left and ran towards the back street and Union Street.

Mrs. Martel returned to her home where she had left her two children in charge of her sister-in-law, Mrs. LeDuke, and told her that she had been attacked by two colored men. She asked Mrs. LeDuke not to tell Mr. Martel if he showed signs of having been drinking. Her unbobbed hair was down and her clothing was dirty and full of sand and grass. A hair ribbon fell on the floor and sand and grass on to Mrs. LeDuke's bed. Mrs. Martel was shaking like a leaf and crying hysterically. There were two small scratches on her lip. She told later of having a sore neck and testified to her corset having been torn. After learning of the attack, the husband immediately complained to the Manchester police, and Lt. Welch was assigned to the case. The lieutenant with the husband went to the scene and found scuff marks in the soft sand from two or three feet inside the sidewalk twenty feet southerly east of the fence as if someone had been dragged. From the end of these marks were two sets of foot prints. One went at a 45 degree angle to the back street at the southwest corner of St. Augustine's Church, the other to the back street practically south.

The defense of the defendant Clark was twofold, that the woman consented and also that he did not have intercourse. He testified at the trial that Mrs. Martel accosted him, took him for a walk, asked him how much money he had for some whiskey, that the talk got around in a way he didn't know very well to sexual intercourse,

that she wanted $5 which he paid to her, that when he learned of her condition after she lay down and before the act started, he desisted and asked for his money back. He said he threatened her if she didn't give up the money, and she and another started hollering. Clark first stated to Lt. Welch at Grenier Field Sunday morning that he was in bed at the time in question the night before, then that he was in the latrine. Both of these stories were shown to be false. When he admitted being with Mrs. Martel, who immediately identified him in the afternoon as the taller soldier that attacked her, he said that he gave her money, either $2.60 or $1.60. He could not remember whether the bill was a one or a two. When this story was read to Mrs. Martel before Clark in the afternoon, she immediately remarked that he was a liar. Much has been made by Clark's counsel of the money that Mrs. Martel had and of the contradictory statement of her husband that he gave her none on Saturday. She testified that she had $10 Saturday night, of which $5 came from Mrs. LeDuke on Friday and $5 from Mr. Martel Saturday noon. The latter denied in his deposition giving her any money Friday or Saturday and on the stand could not remember doing so. He was caught in two or three other false statements. Although employed steadily as a truck driver, he was extremely ignorant and it was findable that any incorrect assertions of his were due to ignorance, faulty memory and to anger over the attack on his wife rather than to any design on his part to uphold his wife in retaining money unlawfully gotten. It was also findable that if Clark's story were true, he could have gotten his bill back from the woman prone on the ground without much commotion or trouble.

Lt. Welch testified that at Grenier Field, Clark admitted having intercourse with the complainant. Lt. Bassett, who was present at the talk, said, "He said that he started to, and that he found there was something wrong with her and stopped before he had completed the act." Also, "But the sum and substance was that he did have relations with her, and he didn't complete the act because he found there was something wrong with her." Lt. Eben L. Mitiguy, the other military officer at the interview, testified: "Well, I understand it insofar as a penetration of that kind starts out, — I understood that the start was made; that's the way I understood it." It was within the province of the jury to find that Clark did admit at Grenier Field Sunday morning that he started to have intercourse — that there was penetration.

Bass, who was not identified by the complainant although accu-

rately described, denied on the stand being at the lot on Spruce Street. He said he was with Clark in the early evening and returned with him after midnight and learned Clark's story from him. Before Lt. Welch, who according to Bass' testimony was courteous and warned him that he didn't have to talk, Bass first told about being in the latrine, then out on the base looking for whiskey, he denied being up city; then when alone with the police lieutenant, Bass said that he didn't have anything to do with the lady, that he didn't know what Charlie Clark done, that they met her on a street. When the two army lieutenants, who confirmed the talk, were called in, Bass said they met this lady on a street, that Charlie spoke to her and they went into a field, somebody started to holler and he ran toward the church. It was findable that this story from Bass caused Clark to change his account and tell about being solicited. In the afternoon when Mrs. Martel's story was read by the police lieutenant before Lt. Bassett and Mrs. Martel, Bass said he walked fast out of the yard, then ran when he heard some one holler. He said he did not hear Clark speak to her about money. Both men had been drinking beer and whiskey Saturday evening.

From the foregoing evidence and findable facts the jury could be satisfied beyond a reasonable doubt of the guilt of both defendants. No exception was taken to the introduction in evidence of the various so-called admissions of the defendants made to Lt. Welch in the presence of military officers and others. "*The Court:* It is all in the presence of the two defendants? *The Witness* [Lt. Welch]: Yes, sir. *Mr. Craig:* Then my objection is withdrawn." Accordingly, under our procedure no discussion is necessary of the manner in which these statements were given. It is of course true that the woman must resist to the extent of her ability at the time but she is not obliged to risk the peril of serious personal injury that may be threatened or that she may fear.

Certain questions of the Solicitor were excepted to as being prejudicial under the rule in *Carbone* v. *Railroad*, 89 N. H. 12. In effect this principle is that an attorney should not suggest in his questions facts that may be prejudicial unless there is or will be evidence of such facts. The first question was put to Bass and suggested that he was guilty of the indictment being tried and of a violation of a regulation against being away from the base without a pass. Bringing out this latter offense, which was admitted in the talk with Lt. Welch, was simply part of the story of the night of August 28th (*State* v. *Peters*, 90 N. H. 438, 440), and was favorable to the defend-

ants rather than otherwise as it was a possible explanation of the lies about being in the latrine or out on the base looking for a whiskey bottle. To the question put to Mr. Martel as to why he told his wife that he was at Lionel's no exception was taken. The question to Lt. Bassett asking if Clark did admit intercourse although not the completion of the act, was sufficiently founded upon evidence, so as not to come within the rule of the *Carbone* case, although excluded by the trial Court.

Many exceptions that were taken to the Solicitor's argument have not been argued and are understood to be waived. Much of the defendants' brief is given to criticism of this argument but without relation to exceptions. This of course raises no points for consideration. Certain exceptions were taken to the argument about the character of Mrs. Martel — that McCarthy should not have argued that she was a prostitute, that there was no evidence but that she was a fair, clean, decent woman and that if they could have gotten evidence of her lack of virtue, the defendants would have produced it. The first two remarks were fair comments upon the evidence and the third upon the lack of it. Evidence of the character of a woman as to unchastity is admissible in a case of this sort to support a defense of consent. *State* v. *Forshner*, 43 N. H. 89; *State* v. *Knapp*, 45 N. H. 148. The defendants excepted to the argument that Martel told his wife a white lie Saturday night. This is understood to relate to what he said as to his whereabouts that night. The point relates to Mr. Martel's credibility only and the remark of the Solicitor was within proper limits. The point of the Solicitor that Mr. McCarthy argued that the solicitor's office should be eliminated could have prejudiced no one. Exception was taken to the argument that Clark's counsel didn't dare to have the base doctor testify. It is now claimed that the Solicitor knew that the funds allotted by the State for the defense were practically exhausted. However this fact was not brought to the attention of the Court and its ruling in the absence of such knowledge was in accord with *Lee* v. *Hustis*, 19 N. H. 434. Moreover the controversy related simply to Bass' injuries at the hands of the military when he resisted giving up his belongings on being put into the guard house. These injuries were fully described by Bass and others. The argument that Grenier Field surrendered to Clark was a harmless description of Clark's conduct when arrested at the base. No one was deceived. Exception was taken to the argument that the testimony of "good clean, straight, reputable men who have lived in our community for many

years" should be believed on the ground that there was no evidence as to the reputation or character. The description of the Solicitor was sufficiently supported by the evidence and the appearance of the men on the stand. The Solicitor argued, "Clark admitted time and time again that he had intercourse with this woman, and he admitted it on that stand and he admitted it down on the base." It has allready been stated that the jury could find that Clark admitted having intercourse to Lt. Welch and the two army lieutenants. Sunday afternoon Mrs. Martel's story was read to Clark and Bass. Clark said he would not make any more statements and did not deny any part of the story. To treat this as an admission of the truth of the story was proper argument. However the record fails to disclose that the defendant Clark on the witness stand admitted intercourse. The argument was error but the question remains whether the trial was rendered unfair thereby. No exception was taken to the statement that Clark made the admission time and time again. The objection seems to have been simply to the place of the admission. The Court charged the jury as follows: "During the arguments counsel may have misquoted the evidence or may have argued without any evidence to support their statement, or they may have drawn unreasonable inferences from the evidence. If so, Mr. Foreman and Gentlemen, disregard such argument, and you will be guided at all times by your own recollection of the evidence, and not the recollection of counsel." It is to be assumed that the jury followed this instruction and used their own recollection of what Clark had or had not admitted in their presence. *State* v. *Hale*, 85 N. H. 403, 412; *State* v. *Small*, 78 N. H. 525, 532. Counsel did not choose to ask for reference to the record of the trial if he thought the Solicitor's error was too great to be cured by the instructions the Court gave. The Court was not obliged to do more than give the above quoted instructions unless counsel pursued his objection further. *Moffatt* v. *Gale*, 92 N. H. 421; *Moran* v. *Dumas*, 91 N. H. 336, 338; *Weiss* v. *Wasserman*, 91 N. H. 164, 167; *Manning* v. *Company*, 90 N. H. 167, 174; *Carr* v. *Orrill*, 86 N. H. 226, 229.

*Exceptions overruled.*

All concurred.